**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

KALIA GONZALEZ, Individually and as a representative of a class of similarly situated persons, on behalf of the NORTHWELL HEALTH 403(B) PLAN,

Plaintiff,

v.

NORTHWELL HEALTH, INC., the NORTHWELL HEALTH 403(B) PLAN COMMITTEE and DOES No. 1-10, Whose Names Are Currently Unknown,

Defendants.

Case No:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

## I. INTRODUCTION

1. Plaintiff, Kaila Gonzalez ("Plaintiff"), individually in her capacity as a participating employee of the Northwell Health 403(b) Plan ("Plan"), formerly known as the North Shore-Long Island Jewish Health System 403(b) Plan, brings this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participating employees, against Defendants, Northwell Health, Inc. ("Northwell"), the Northwell Health, Inc. 403(b) Plan Committee ("Administrative Committee"), and Does No. 1-10, who are members of the Administrative Committee or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and related breaches of applicable law beginning six years from the date this action is filed and continuing to the date of judgment (the "Class Period").

2. Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto*

retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 403(b) plans and 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3. The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4. As of December 31, 2018, the Plan had 56,289 participants with account balances and assets totaling over $5.6 billion, placing it in the top 0.1% of defined contribution plans by plan size. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of defined contribution plans and the investment of defined contribution assets. The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5. Defendants maintain the Plan and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services. Defendants are fiduciaries under ERISA, and, as such, are obligated to (a) act for the exclusive benefit of participants, (b) ensure that the investment options offered through the Plan are prudent and diverse, and (c) ensure that Plan expenses are fair and reasonable.

6. Defendants have breached their fiduciary duties to the Plan and, as detailed below, have: (1) allowed unreasonable recordkeeping/administrative expenses to be charged to

the Plan; and (2) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

7. To remedy these fiduciary breaches and other violations of ERISA, Plaintiff brings this action under ERISA Sections 404, 409 and 502, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan and the proposed class defined below (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8. Plaintiff specifically seeks the following relief:

a. A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b. A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c. Equitable, legal or remedial relief for all losses and/or compensatory damages;

d. Attorneys' fees, costs and other recoverable expenses of litigation; and

e. Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II. <u>THE PARTIES</u>

9. Plaintiff is a former employee of Northwell and is a current participant in the Plan under 29 U.S.C. § 1002(7). Plaintiff is a resident of Bronx County, New York.

10. Northwell is a New York domestic not-for-profit corporation headquartered in Westbury, Nassau County, New York. Northwell is the largest healthcare provider in New York, offering clinical care through numerous hospitals and outpatient facilities.

11. The Administrative Committee is the Plan administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102. The Administrative Committee maintains its address at Northwell's corporate headquarters in Westbury, New York. The Administrative Committee and its members are appointed by Northwell to administer the Plan on Northwell's behalf.

12. Does No. 1-10 are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan. Plaintiff is currently unable to determine the membership of the Administrative Committee or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Administrative Committee and the identity of any other fiduciaries is not publicly available. As such, these defendants are named Does 1-10 as placeholders. Plaintiff will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Administrative Committee and other responsible individuals as defendants as soon as their identities are discovered.

## III. JURISDICTION AND VENUE

13. Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

15. Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Northwell's principal place of business is in this District and the Plan is administered from this District. Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Background And Plan Structure

16. The Plan is a single-employer 403(b) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan. Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon. The Plan pays Plan expenses from Plan assets, and substantially all administrative expenses are paid by participants as a reduction of investment income. Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses. The available investment options for participants of the Plan include various mutual funds and a fixed interest separate account.

17. Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities. Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC"). Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

18. The MetLife Fixed Interest Separate Account is a stable value fund that invests in a guaranteed separate account under a group annuity contract. The Separate Account's

guarantees of principal and interest are backed by the assets of Metropolitan Life Insurance Company.

19. Transamerica Retirement Solutions, LLC ("Transamerica"), which Defendants engaged, was the recordkeeper for the Plan throughout the Class Period. As the recordkeeper, Transamerica is responsible for maintaining records with respect to employees' accounts in the Plan, effecting participant Plan investment elections, and performing administrative functions such as processing loan and withdrawal requests.

20. During the Class Period, Plan assets were held in trusts by the primary custodians of the Plan, State Street Bank and Trust Company and Transamerica Financial Life Insurance Company Inc. All investments and asset allocations are performed through these trusts.

## B. Defendants' Breaches of Fiduciary Duties

21. As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan. Plaintiff did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

### 1. The Plan's Excessive Recordkeeping/Administrative Costs

22. An obvious indicator of Defendants' breach of their fiduciary duties is the Plan's excessive recordkeeping and administrative costs. According to one industry publication,[1] the average cost for recordkeeping and administration in 2017 for plans much smaller than the Plan (plans with 100 participants and $5 million in assets) was $35 per participant.[2] As of December 31, 2018, the Plan had more than $5.6 billion in assets and 56,289 participants. Given its size,

[1] The 401k Averages Book (20th ed.).

[2] Other courts have acknowledged that a plan with $3.4 billion in assets and 41,863 active participants should be paying $30 per participant (*Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018)) and that the "market rate" of total administrative fees for "jumbo" plans, *i.e.*, those within the top 1%, should be $35 per participant (*Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017)).

and resulting negotiating power, with prudent management and administration, the Plan should have unquestionably been able to obtain a per-participant cost significantly lower than $30 per participant.

23. For most of the Class Period, until January 1, 2020, participants each paid a flat annual fee of $60. According to participant disclosures, this was broken down into a $45 per participant charge for recordkeeping services and a $15 per participant charge for other general administrative services, including legal, accounting, and auditing. As of January 1, 2020, the annual fee was reduced to $52 per participant as a result of a reduction in the recordkeeping charge to $37 per head. This change did not rectify the issue; both $60 and $52 per participant are far in excess of what Defendants should have been able to negotiate for the Plan if they had acted consistent with their fiduciary duties.

24. As such, it is clear that Defendants either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly-sized defined contribution plans, or were complicit in paying grossly excessive fees. Had Defendants conducted any examination, comparison, or benchmarking, Defendants would have known that the Plan was compensating Transamerica at levels inappropriate for its size and scale. Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings since the excessive fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

25. By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

**2. The Plan's Objectively Imprudent Investment Options**

26. Several of the Plan's investment options are objectively imprudent, separate and apart from the apparent excesses with respect to the Plan's recordkeeping and administrative fees, as well as its relationship with Transamerica, which the Plan entered into at Defendants' behest.

27. It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational. This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here. The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ERi = Rf + \beta i(ERm - Rf)$, where:

$ERi$=expected return of investment
$Rf$=risk-free rate
$\beta i$=beta of the investment
$(ERm - Rf)$=market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively-managed mutual fund, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[3] Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving an associated return above the benchmark returns.

i. The 50% Diamond Hill/50% Dodge & Cox Large Value Option

[3] In this instance, the index benchmark takes the place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

28. The 50% Diamond Hill/50% Dodge & Cox Large Value Option[4] has consistently and significantly underperformed its benchmark, a 50/50 split of the Russell 1000 and S&P 500 Indexes,[5] since its inception in March 2014. From the moment the fund had three- and five-year track records, its annualized returns have failed to beat those of the benchmark in every single trailing three- and five-year period:

**Three-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 1000/ S&P 500 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 1Q2017 | 9.38% | 10.18% | -0.80% |
| 2Q2017 | 8.69% | 9.44% | -0.75% |
| 3Q2017 | 10.27% | 10.72% | -0.45% |
| 4Q2017 | 10.90% | 11.32% | -0.42% |
| 1Q2018 | 10.06% | 10.58% | -0.52% |
| 2Q2018 | 9.95% | 11.78% | -1.83% |
| 3Q2018 | 16.07% | 17.19% | -1.12% |
| 4Q2018 | 8.69% | 9.17% | -0.48% |
| 1Q2019 | 12.75% | 13.51% | -0.76% |
| 2Q2019 | 13.99% | 14.17% | -0.18% |
| 3Q2019 | 11.59% | 13.29% | -1.70% |
| 4Q2019 | 11.85% | 15.16% | -3.31% |

[4]The 50% Diamond Hill/50% Dodge & Cox Large Value Option is comprised of the Diamond Hill Large Cap A Fund and the Dodge & Cox Stock Fund.
[5]The Russell 1000 Index is the benchmark for the Diamond Hill Large Cap A Fund and the S&P 500 Index is the benchmark for the Dodge & Cox Stock Fund.




**Five-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 1000/ S&P 500 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 1Q2019 | 8.57% | 10.77% | -2.20% |
| 2Q2019 | 8.66% | 10.58% | -1.92% |
| 3Q2019 | 8.82% | 10.73% | -1.91% |
| 4Q2019 | 9.88% | 11.59% | -1.71% |




29. As is clearly exhibited by the weak performance shown above, the fund has never been an appropriate investment option for the Plan. When an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark. By way of example and to illustrate, there is a Vanguard Russell 1000 Index Fund that simply tracks the Russell 1000 Index, with a very low expense ratio of 7 basis points (0.07%) for the Institutional share class. There is also a Vanguard 500 Index Fund that tracks the S&P 500 Index, with a very low expense ratio of 4 basis points (0.04%) for the Admiral share class. If Defendants desired to stick with a large cap value fund to replace the Large Value Option, there is a Vanguard Russell 1000 Value Index Fund that simply tracks the Russell 1000 Value Index,[6] with a very low expense ratio of 7 basis points (0.07%) for the Institutional share class. While participants should have had the option to achieve any of the indexes' returns at minimal cost, Defendants'

---

[6]The quarterly statements received by Plaintiff, and all Plan participants, include a chart of where each asset class, as defined by Morningstar, falls on the risk spectrum. This chart lists the Russell 1000 Value Index as the benchmark for large cap value funds.

imprudence in retaining the 50% Diamond Hill/50% Dodge & Cox Large Value Option instead forced them to pay 74 basis points[7] (0.74%) to consistently lag those indexes. Defendants' failure to replace this underachieving investment option with better performing alternatives was a severe breach of fiduciary duty.

ii. The 50% Champlain/50% Diamond Hill Small Cap Option

30. The 50% Champlain/50% Diamond Hill Small Cap Option[8] has consistently and significantly underperformed its benchmark, a 50/50 split of the Russell 2000 and Russell 2500 Indexes,[9] since its inception in July 2013. From the moment the fund had three- and five-year track records, its annualized returns have failed to beat those of the benchmark in every single trailing three- and five-year period:

**3-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000/ Russell 2500 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 3Q2016 | 3.04% | 7.24% | -4.20% |
| 4Q2016 | 2.99% | 6.84% | -3.85% |
| 1Q2017 | 3.96% | 7.33% | -3.37% |
| 2Q2017 | 3.50% | 7.15% | -3.65% |
| 3Q2017 | 7.27% | 11.40% | -4.13% |
| 4Q2017 | 6.13% | 10.02% | -3.89% |

[7]Participants invested in the Large Cap Value Option receive an annual plan service credit in the amount of 30.2 basis points (0.302%), which is directly applied to their account, and results in an effective expense ratio of 43.8 basis points (0.438%). This is still many multiples higher than the fees participants could (and should) have paid for significantly better investment alternatives that simply matched the performance of the indexes.

[8]The 50% Champlain/50% Diamond Hill Small Cap Option is comprised of the Champlain Small Company Adv Fund and the Diamond Hill Small-Mid Cap A Fund.

[9]The Russell 2000 Index is the benchmark for the Champlain Small Company Adv Fund and the Russell 2500 Index is the benchmark for the Diamond Hill Small-Mid Cap A Fund.

| | | | |
|---|---|---|---|
| 1Q2018 | 6.07% | 8.28% | -2.21% |
| 2Q2018 | 8.13% | 10.63% | -2.50% |
| 3Q2018 | 15.09% | 16.63% | -1.54% |
| 4Q2018 | 6.88% | 7.34% | -0.46% |
| 1Q2019 | 12.25% | 12.74% | -0.49% |
| 2Q2019 | 11.44% | 12.32% | -0.88% |
| 3Q2019 | 8.62% | 8.87% | -0.25% |
| 4Q2019 | 8.32% | 9.46% | -1.14% |




**Five-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000/ Russell 2500 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 3Q2018 | 7.50% | 11.22% | -3.72% |
| 4Q2018 | 1.94% | 4.78% | -2.84% |

| | | | |
|---|---|---|---|
| 1Q2019 | 4.80% | 7.42% | -2.62% |
| 2Q2019 | 4.84% | 7.36% | -2.52% |
| 3Q2019 | 6.44% | 8.38% | -1.94% |
| 4Q2019 | 6.78% | 8.58% | -1.80% |




31. Once again, as is clearly exhibited by the weak performance shown above, the fund has never been an appropriate investment option for the Plan. When an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark. By way of example and to illustrate, there is a Vanguard Russell 2000 Index Fund that simply tracks the Russell 2000 Index, with a very low expense ratio of 8 basis points (0.08%) for the Institutional share class. There is also an iShares Russell Small/Mid-Cap Index Fund that tracks the Russell 2500 Index, with a very low expense ratio of 12 basis points (0.12%) for the Institutional share class. While participants should have had the option to achieve either of the indexes' returns at

minimal cost, Defendants' imprudence in retaining the 50% Champlain/50% Diamond Hill Small Cap Option instead forced them to pay 126 basis points[10] (1.26%) to consistently lag those indexes. Defendants' failure to replace this underachieving investment option with better performing alternatives was a severe breach of fiduciary duty.

iii. The Lazard Emerging Markets Fund

32. The Lazard Emerging Markets Fund Institutional Class has also substantially and repeatedly underperformed its benchmark, the MSCI Emerging Markets Index, on a rolling three- and five-year annualized basis:

**Three-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | MSCI Emerging Markets Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 2Q2015 | 2.06% | 3.71% | -1.65% |
| 3Q2015 | -7.04% | -5.27% | -1.77% |
| 4Q2015 | -8.78% | -6.76% | -2.02% |
| 1Q2016 | -5.85% | -4.50% | -1.35% |
| 2Q2016 | -1.89% | -1.56% | -0.33% |
| 3Q2016 | -1.17% | -0.56% | -0.61% |
| 4Q2016 | -2.66% | -2.55% | -0.11% |
| 1Q2017 | 0.74% | 1.18% | -0.44% |
| 2Q2017 | -1.60% | 1.07% | -2.67% |

[10]Participants invested in the Small Cap Option receive an annual plan service credit in the amount of 45.1 basis points (0.451%), which is directly applied to their account, and results in an effective expense ratio of 80.9 basis points (0.809%). This is still many multiples higher than the fees participants could have paid for significantly better investment alternatives that simply matched the performance of the indexes.

| | | | |
|---|---|---|---|
| 3Q2017 | 2.65% | 4.90% | -2.25% |
| 4Q2017 | 7.20% | 9.10% | -1.90% |
| 1Q2018 | 8.62% | 8.81% | -0.19% |
| 2Q2018 | 3.15% | 5.60% | -2.45% |
| 3Q2018 | 10.08% | 12.36% | -2.28% |
| 4Q2018 | 8.11% | 9.25% | -1.14% |
| 1Q2019 | 7.72% | 10.68% | -2.96% |
| 2Q2019 | 6.99% | 10.66% | -3.67% |
| 3Q2019 | 2.68% | 5.97% | -3.29% |
| 4Q2019 | 7.37% | 11.57% | -4.20% |



**Five-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | MSCI Emerging Markets Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 2Q2017 | 3.12% | 3.96% | -0.84% |
| 3Q2017 | 3.07% | 3.99% | -0.92% |
| 4Q2017 | 3.21% | 4.35% | -1.14% |
| 1Q2018 | 3.86% | 4.99% | -1.13% |
| 2Q2018 | 2.43% | 5.01% | -2.58% |
| 3Q2018 | 0.82% | 3.61% | -2.79% |
| 4Q2018 | -0.67% | 1.65% | -2.32% |
| 1Q2019 | 0.87% | 3.68% | -2.81% |
| 2Q2019 | -0.44% | 2.49% | -2.93% |
| 3Q2019 | 0.00% | 2.33% | -2.33% |
| 4Q2019 | 3.56% | 5.61% | -2.05% |



33. Again, when an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark. By way of example and to illustrate, there is a Fidelity Emerging Markets Index Fund that simply tracks the MSCI Emerging Markets Index, with a very low expense ratio of 7.6 basis points (0.076%). While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Lazard Emerging Markets Fund instead forced them to pay 108 basis points[11] (1.08%) to consistently lag the index. Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of their fiduciary duty.

iv. The 50% Causeway/50% BNY Mellon International Option

34. The 50% Causeway/50% BNY Mellon International Option[12] has also consistently and significantly underperformed its benchmark, the MSCI EAFE Index,[13]for long periods on a rolling three- and five-year annualized basis:

**Three-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | MSCI EAFE Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 2Q2015 | 9.95% | 11.97% | -2.02% |
| 3Q2015 | 3.75% | 5.63% | -1.88% |

[11]Participants invested in the Emerging Markets Fund receive an annual plan service credit in the amount of 15 basis points (0.15%), which is directly applied to their account, and results in an effective expense ratio of 93 basis points (0.93%). This is still many multiples higher than the fees participants could have paid for significantly better investment alternatives that simply matched the performance of the index.
[12]The 50% Causeway/50% BNY Mellon International Option is comprised of the Causeway International Value Inv Fund and the BNY Mellon International Stock I Fund.
[13]The MSCI EAFE Index is the benchmark for both the Causeway International Value Inv Fund and the BNY Mellon International Stock I Fund.

| | | | |
|---|---|---|---|
| 4Q2015 | 3.30% | 5.01% | -1.71% |
| 1Q2016 | 1.74% | 2.23% | -0.49% |
| 2Q2016 | 1.65% | 2.06% | -0.41% |
| 3Q2016 | 0.35% | 0.48% | -0.13% |
| 4Q2016 | -1.66% | -1.60% | -0.06% |




**Five-Year Trailing Performance**

| **As of** | **Performance, adjusted for investment expense** | **MSCI EAFE Index Benchmark** | **Investment Option Performance/Underperformance Compared to Benchmark** |
|---|---|---|---|
| 2Q2015 | 9.26% | 9.54% | -0.28% |
| 3Q2015 | 3.85% | 3.98% | -0.13% |
| 4Q2015 | 3.27% | 3.60% | -0.33% |
| 1Q2016 | 1.91% | 2.29% | -0.38% |
| 2Q2016 | 1.73% | 1.68% | 0.05% |

| | | | |
|---|---|---|---|
| 3Q2016 | 7.96% | 7.39% | 0.57% |
| 4Q2016 | 6.18% | 6.53% | -0.35% |
| 1Q2017 | 4.97% | 5.83% | -0.86% |
| 2Q2017 | 7.88% | 8.69% | -0.81% |
| 3Q2017 | 7.54% | 8.38% | -0.84% |
| 4Q2017 | 7.50% | 7.90% | -0.40% |
| 1Q2018 | 6.49% | 6.50% | -0.01% |
| 2Q2018 | 6.10% | 6.44% | -0.34% |




35. Again, when an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark. By way of example and to illustrate, there is an iShares MSCI EAFE International Index Fund that simply tracks the MSCI EAFE Index, with a very low expense ratio of 3 basis points (0.03%). While participants should have had the option to

achieve the index's returns at minimal cost, Defendants' imprudence in retaining the 50% Causeway/50% BNY Mellon International Option instead forced them to pay 102 basis points[14] (1.02%) to consistently lag the index. Defendants' failure to replace this underachieving investment option with better performing alternatives also was a severe breach of fiduciary duty.

## V. ERISA'S FIDUCIARY STANDARDS

36. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A) for the exclusive purpose of
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

37. Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

[14] Participants invested in the International Option receive an annual plan service credit in the amount of 24.5 basis points (0.245%), which is directly applied to their account, and results in an effective expense ratio of 77.5 basis points (0.775%). This is still many multiples higher than the fees participants could have paid for significantly better investment alternatives that simply matched the performance of the index.

38. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

39. ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

40. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

41. 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to

> the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI. CLASS ALLEGATIONS

42. This action is brought as a class action by Plaintiff on behalf of herself and the following proposed class (the "Class"):

> All participants and beneficiaries in the Northwell Health 403(b) Plan (the "Plan") at any time on or after July 21, 2014 to the present (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

43. This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

44. **Numerosity**. Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States. As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

45. **Commonality**. There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a) Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b) Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c) Whether and what form of relief should be afforded to Plaintiff and the Class.

46. **Typicality**. Plaintiff, who is a member of the Class, has claims that are typical of all of the members of the Class. Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

47. **Adequacy of Representation**. Plaintiff will fairly and adequately represent the interests of the members of the Class. Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class. Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

48. **Potential Risks and Effects of Separate Actions**. The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

49. **Predominance**. Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages incurred by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

50. **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class members are unaware of

Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

51. **Manageability**. This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

52. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

53. Plaintiff's counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

54. Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3).

**COUNT I**
**(For Breach of Fiduciary Duty)**

55. Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

56. Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan. In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

57. To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

58. As a direct result of Defendants' breaches of fiduciary duties, the Plan has suffered losses and damages.

59. Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

**COUNT II**

**(Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)**

60. Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

61. Northwell is responsible for appointing, overseeing, and removing members of the Administrative Committee.

62. In light of its appointment and supervisory authority, Northwell had a fiduciary responsibility to monitor the performance of the Administrative Committee and its members.

63. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

64. To the extent that fiduciary monitoring responsibilities of Northwell was delegated, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

65. Northwell breached its fiduciary monitoring duties by, among other things:

(a) Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as

a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b) Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c) Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

66. As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Northwell discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized and/or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

67. Northwell is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count; to restore to the Plan any profits made through use of Plan assets; and is subject to other equitable or remedial relief as appropriate.

68. Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT III**
**(In the Alternative, Liability for Participation In Breach of Fiduciary Duty)**

69. Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

70. In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

71. To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and the other expenses of the Plan.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself, the Class and the Plan, demands judgment against Defendants, for the following relief:

(a) Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b) Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c) Pre-judgment and post-judgment interest at the maximum permissible rates,

whether at law or in equity;

(d) Attorneys' fees, costs and other recoverable expenses of litigation; and

(e) Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

**JURY DEMAND**

Plaintiff demands a jury trial with respect to all claims so triable.

**NOTICE PURSUANT TO ERISA § 502(h)**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: July 21, 2020

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP

/s/ Laurie Rubinow

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
lrubinow@sfmslaw.com

James C. Shah
Michael P. Ols
Alec J. Berin
Shepherd Finkelman Miller & Shah, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com
mols@sfmslaw.com
aberin@sfmslaw.com

Kolin C. Tang
Shepherd Finkelman Miller & Shah, LLP
1401 Dove Street, Suite 510
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

*Attorneys for Plaintiffs, the Plan and the Proposed Class*